# State *ex rel.* Sanche v. Webb *et al.*

*Proceeding to annul Charter of a Corporation.*

1. *Constitutional law; ratification of a corporate charter by special act.*—The General Assembly has the same power to confirm and validate an irregularly organized corporation, as it has to bring into existence a new one; and constitutional provisions forbidding the creation of a corporation by special act of the legislature, except for certain specified purposes, (Const. Art. XIV, § 1), does not prevent the legislature from ratifying by special act irregularities in the formation under the general law of a corporation included in the exception, and thereby validating an invalid charter of such corporation, and making a *de jure* out of what was only a *de facto* corporation.

2. *Same; operation of general law may be suspended by a special law for benefit of manufacturing corporations or interests.*—Under the terms of section 24 of Article IV of the constitution, which provides that the provision of the constitution as to special legislation shall not apply to "manufacturing corporations or interests," the General Assembly can pass any special law for the protection or benefit of any manufacturing interests, whether owned and conducted by corporations or individuals, even though such special legislation have the effect of suspending the operation of a general law for the benefit of such manufacturing interests; and an act of the legislature confirming and validating a manufacturing corporation, irregularly organized under the general law, is not unconstitutional as suspending the operation of the *quo warranto* statute—a general law of the State—in contravention of

[State *ex rel.* Sanche v. Webb *et al.*]

the provision of the constitution prohibiting the suspension by the General Assembly of the operation of any general law "for the benefit of any individual, corporation or association." (Const. Art. IV, § 23).

3. *Same; confirmative effect of validating statute not affected by one of its sections being upon a distinct subject of legislation.*—Where a special act, to amend the charter of a manufacturing corporation, irregularly organized under the general law, recognizes in its title and first section the corporation as a lawful corporation, and ratifies and validates the attempted formation under the general law, the fact that the second section of said act, by expressly ratifying and confirming the charter as amended by the first section, may be upon a distinct subject of legislation, not comprehended within the title, and, therefore, inoperative under the constitution (Const. Art. IV, § 2), can not destroy or impair the effect of the special act; since the express confirmation declared in the latter section does not possess greater validating potency than the express recognition of the corporation as a lawful organization contained in the title and first section.

4. *Same; effect of recognition by special act to be a regularly formed corporation.*—Where in a special act amending the charter of a manufacturing corporation, which was irregularly organized under the general law, there is a recognition of such corporation as a lawful corporate body, including expressly the integrity and validity of the amendment, the legal effect of such special act is a re-enactment of the charter, curative of all vitiating elements by reason of irregularities in its formation.

5. *Pleas; facts stated as inducement do not render a plea double.*—The facts which are averred in a plea as an inducement merely to the defense attempted to be set up, and not purporting to be an answer to the complaint, do not render the plea double, although the facts, as alleged, were unnecessary to the defense; only the material substance of the plea as a whole will be regarded.

6. *Constitutional law; act reducing stock of a corporation to the real value of property paid therefor not unconstitutional, and renders charters unassailable.*—Where a manufacturing corporation is fraudulently organized under the general law of the State by the corporators knowingly issuing the amount of the authorized capital stock for property worth only one-half the par value of the stock, the legislature may, by special act, correct and waive the vice of the fraudulent organization by reducing the amount of the stock, which the property at its fraudulent overvaluation had purchased, to the extent of one-half, and cancelling the remainder of the shares, which had been relinquished and surrendered to the corporation by the stockholders, thereby purging the corporation of all fraud, and establishing it as an honest, valid corporate body; and there is no constitutional limitation upon the power of the legislature to pass such an act for the accomplishment of this result, nor is the power affected by section 6 of Article XIV of the constitution, which provides that "No corpora-

[State *ex rel.* Sanche v. Webb *et al.*]

tion shall issue stocks or bonds except for money, labor done, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void.".

7. *Plea puis darrien, continuance; what constitutes it.*—In our system of pleadings, forms are not essential, and the substance of the plea determines its legal effect; and when the matters pleaded arose after the institution of the suit, and before the interposition of the plea, the plea is therefore one of *puis darrien continuance*, notwithstanding it purports to be in bar of the further maintenance of the suit.

8. *Same; effect of judgment thereon in favor of defendant as to costs.*—Under the provisions of the statute, (Code, § 2848), that when a party files a plea of *puis darrien continuance* and succeeds thereon, but fails on the plea to the merits previously filed, he must be taxed with the costs which accrued previous to the filing of the last plea, where the defendant, together with pleas in bar, files a plea of *puis darrien continuance*, which, in its essence, is an answer to the whole complaint, and upon a demurrer being overruled thereto the plaintiff declines to plead over, but joins issue upon the other pleas, and without sending those issues to the jury the court rendered judgment for the de-fendants upon the plaintiff's confession of the plea of *puis darrien continuance*, all the costs should not be against the plaintiff, but those costs which accrued prior to the filing of the plea of *puis darrien continuance* should be adjudged against the defendants.

APPEAL from the Circuit Court of Jefferson, Tried before the Hon. JAMES J BANKS.

This action was instituted by the State of Alabama on the relation of Hercules Sanche, under section 3170 of the Code, against the appellees, to have annulled and vacated the existence of an alleged corporation, on the ground that the defendants were acting as a corporation, without being duly incorporated.

On the former appeal of this case, the complaint was held sufficient.—97 Ala. 111.

Upon the remandment of the cause, the defendants filed four pleas. The plaintiff demurred to each of these pleas.

The grounds of the demurrer to the third plea were as follows : 1st. The said plea proposes an immaterial and irrelevant issue. 2d. Said plea is wholly insufficient as showing compliance with statutory prerequisites in the organization of said company. 3d. Said plea is double for setting up matters existing at the bringing of the suit and also those occurring since its last continuance. 4th. Said act of the legislature set forth in the

[State *ex rel*. Sanche v. Webb *et al.*]

plea is unconstitutional, null and void. 5th. It is not competent for the legislature to suspend a general law for the benefit of the defendant. 6th. Whether said company was a body corporate at the passage of said act was a judicial and not a legislative question, and the recital in the act that the Electro-Libration Company was a body corporate could not make it such, so as to exert any influence upon this suit which was then pending. 7th. It is not competent for the legislature to create a capital stock corporation, out of an association of persons having no capital stock, or existing under the circumstances shown in the complaint. 8th. The second section of said act is invalid, because containing a subject not embraced by the title ; and neither the first section nor the title operates so as to make said company a corporation, nor exert any influence on this case. 9th. Said act violates that section of the State constitution (if construed to defeat this action) which provides that ''no person shall be debarred from prosecuting or defending before any tribunal in this State by himself or counsel any civil cause to which he is a party.'' 10th. Said act (if construed to affect this suit) would be a special law enacted for the benefit of individuals, or would suspend the operation of general laws (that is, those relating to information in the nature of *quo warranto* and those relating to organization of corporations) for the benefit of the defendants and their association, and would, therefore, be void. 11th. Said act does not purport or pretend to create a corporation, and does not give corporate life if none then existed, and can not be construed to constitute a defense to this action, nor a bar to its further prosecution. 12th. Said plea is one in bar of the further maintenance of the suit, and yet contains matters not pertinent to such a plea. 13th. Said plea is incongruous in containing matters arising after action brought and other matters not arising after action brought, and not sufficient as an inducement to said act of the legislature. 14th. Said plea does not set up such facts that a material issue of facts can be taken thereon. 15th. Said plea fails to offer to pay the costs that have accrued up to the filing thereof. All of the demurrers to the several pleas being overruled, the plaintiffs thereupon joined issue on the 1st, 2d and 4th pleas, but declined to take issue on, or plead over to, the 3d plea ; and upon their declin-

ing to plead over as to the 3d plea, the court rendered final judgment in favor of the defendants, and adjudged all the costs of the suit against the plaintiffs. From this judgment the present appeal is prosecuted, and the rendition of said judgment, and the overruling of the demurrers to the pleas are assigned as error. The allegations of the 3d plea are sufficiently stated in the opinion.

CABANISS & WEAKLEY and CHAS. A. SENN, for appellant.—The third plea of the defendant was not sufficient, and the demurrers thereto should have been sustained. The authorities make a technical distinction between a plea *puis darrien continuance* and a plea in bar of further maintenance, in that the former sets up matter arising after plea pleaded or issue joined, and the latter sets up matter arising before plea pleaded, but both of them set up matter arising after suit brought, and if a plea setting up matter after the commencement of the suit, purports to be in bar of the action, it is demurrable.—*McDougald v. Rutherford*, 30 Ala. 253. "The rule is that when matter of defense has arisen after the commencement of of the suit, it can not be pleaded in bar of the action generally, but must, when it has arisen before plea or continuance, be pleaded as to the further maintenance of the suit, and when it has arisen after issue joined, *puis darrien continuance.*"—*Yeaton v. Lynn*, 5 Peters, 224; *Lee v. Levy*, 4 Barn. & Cress. 390; *LeBret v. Papillon*, 4 East 502; *Evans v. Prosser*, 3 T. R. 95; *Winston v. Moseley*, 2 Stew. 137; *Puckett v. Pope*, 3 Ala. 552; *Ins. Co. v. Cochran*, 27 Ala. 229; *State v. Brantley*, 27 Ala. 44; *Barber v. Dixon*, 1 Wilson Rep. 44; *Worford v. Isbel*, 1 Bibb's Rep. 247.

2. There was error in the court's rendering judgment for all the costs against the plaintiffs.—*Dolberry v. Trice*, 49 Ala. 207; *Hitt v. Lacy*, 3 Ala. 104.

JAMES E. WEBB, *contra.*—1. A subsequent ratification by the legislature, waives all defects in the original corporate organization. And the legislature is fully able by such subsequent waiver to excuse the absence of any thing which by previous act it could under the constitution have waived in advance.—*Cen. A. & M. Asso. v. Ins. Co.*, 70 Ala. 120; *B. & L. Asso. v. Coleman*, 89 Pa. St. 428; 1 Morawetz on Corporations, §§ 20, 959.

2. The State, by legislative act, may waive any irregularity or defect in the original proceedings for the incorporation, which is not required by the constitution or by it prescribed as a condition of corporate organization.—4 Amer. & Eng. Encyc. of Law, 189; *Lehman Durr & Co.* v. *Warner*, 61 Ala. 455; *Atty Gen.* v. *R. R. Co.*, 6 Iredell Law (N. C.) 456; Cooley's Limitations, 463; *Goodrich* v. *Reynolds*, 31 Ill. 498; *Bridge Co.* v. *United States*, 105 U. S. 480; *Clinton Bridge Case*, 10 Wall. 462.

3. Section 6 of Article XIV of the constitution does not affect the power of the legislature to pass such an act as is involved in this case, and said act is not unconstitutional.—See authorities cited under second proposition.

4. The issue of stock in the organization of the Electro-Libration Company was not entirely fictitious. Therefore it was not such a violation or any violation of section 6, Article XIV of the constitution, as that the legislature could not ratify and confirm. If the parties, who owned the invention, acted in good faith, if. the parties who owned the discovery or invention of Hercules Sanche, which was entitled to be patented, and has since been patented, in the United States and in many foreign countries as averred in some of the pleas, and which, by subsequent tests, has been shown to be very remunerative, actually believed that the discovery possessed a very large intrinsic value, and made their subscription in good faith, then it was not fraudulent. And this is true, although at the time it had not received a patent, and its utility and money making capacity had not been tested. The fact that its real value was so. entirely unknown to the public, it did not then have any market value at all, because it was unknown, can not either add to or take away from it whatever of intrinsic value it had. Oftentimes new discoveries can not be communicated to the public until patented, without the discoverer losing the benefit, or run the risk of losing the benefit of his discovery. Though it was unknown and had no market value for that reason, yet, nevertheless it was such property, as when actually conveyed to the corporation, in good faith, satisfied every demand of section 6 of Article XIV of the constitution.—*Phelan* v. *Hazard*, 5 Dillon 55; *Lake Sup. Iron Co.* v. *Drexel*, 90 N. Y. 87;

*New Haven Co. v. Linden Spr. Co.*, 142 Mass. 349; *Carr v. LeFevre*, 27 Pa. St. 417; *Coit v. Gold Co.*, 119 U. S. 343; *Liebke v. Knapp*, 79 Mo. 22; *Young v. Erie I. Co.*, 65 Mich. 111; *Edwards v. Sugar Co.*, 27 La. Ann. 118.

HEAD, J.—The questions of prime importance, in this record, are, first, the sufficiency of the third plea, as tested by the demurrers which are interposed to it, and which were overruled; and, second, if the demurrers were properly overruled, what judgment should have been rendered, upon the plaintiff declining to plead over—there being other pleas in bar, upon which issues were joined?

The plea, in the form of its conclusion, is one in bar of the further maintenance of the action, at common law; and, in other repects, it is a plea *puis darrein continuance.* The gravamen of the complaint is, that in the organization of the Electro–Libration Company, under the general laws of the State, the board of corporators, and the subscribers to the capital stock, fraudulently overvalued the property agreed to be transferred to the company in payment of the stock subscriptions; and further, that the organization of the company was never completed by the issuance of the certificate of incorporation required by the statute to be issued by the judge of probate. The complaint shows that the organization was in accordance with law, in all other respects. The incorporation took place in 1887, in the office of the probate judge of Jefferson county, Ala.; and in February, 1893, after this suit was brought, but before plea pleaded, the General Assembly of Alabama enacted the following statute:

"An act to amend the charter of the Electro-Libration Company, which is a body corporate chartered under the general statutes of the State of Alabama, and to reduce its capital stock.

"Section 1. *Be it enacted by the General Assembly of Alabama,* That the charter of the Electro-Libration Company, which is a body corporate under the general laws of Alabama, having been incorporated by declaration filed in the probate office of Jefferson county, Alabama, be, and the same is, hereby amended, by the reduction of its authorized capital stock from one million dollars to five hundred thousand dollars, and that five thousand shares of the capital stock of said corporation which is

[State *ex rel*. Sanche v. Webb *et al.*]

held by the said company having been contributed and surrendered to it by its original subscribers, and which is now in the treasury of said company, be, and the same is hereby cancelled and shall not be issued.

"Section 2. *Be it further enacted*, That the charter of said corporation heretofore granted by M. T. Porter as probate judge of Jefferson county, under the general statutes of incorporation of this State as so amended as above set forth be, and the same is, hereby ratified and confirmed."

The plea set out this act, prefacing it with the following matter: "The said defendants for further plea say that they deny that the subscription for the capital stock of the said Electro-Libration Company was fictitious, and they deny that the issue of said stock upon said subscription was fictitious, but that, on the contrary, they aver that it was issued for property actually received, which was conveyed according to the terms of the said subscription, and that said subscription of said stock was made in good faith and without any fraudulent intent to violate the law, or the constitution of the State of Alabama in that respect, but made in the honest belief that said patent and patent rights and inventions were of a large intrinsic value, which belief had been proved to be true by the subsequent investigation and developments thereof. And they further say that since the beginning of this suit, and since the last continuance in this case," &c. averring the passage of said act and setting it out. Without stating the several grounds, we will notice the questions raised by, and the views insisted upon in support of, the demurrers to the plea.

It is not denied that the legislature, unrestrained by constitutional limitation, may validate an invalid charter of a corporation, or by express confirmation, or by plain recognition of it as an existing *de jure* body corporate. We quote from the brief of plaintiff's counsel on this subject. They say: "But the defense set up in the third plea proceeds upon the idea that the legislature is omnipotent in the matters of creating corporations, and that a recognition by it of an organization as a corporation, by amending its charter or otherwise, makes it one from thenceforth, or at least forestalls all further inquiry into the matter. That this is true *in the absence of some constitutional lim-*

*itation or restriction* no one will deny. For instance, it has been many times asserted that the State may waive its rights to forfeit a charter of a corporation, or it may cure defects in matters of form leading up to the organization of a corporation. Many authorities upon these questions are cited by Mr. Cook in his work on Stocks and Stockholders (1 Vol. § 636, p. 874; Third Edition.) The exact rule is correctly stated by the Supreme Court of the United States in *Comanche County v. Lewis*, 133 U. S. 198, 33 Law Ed. 604 as follows: 'It is universally affirmed that *when* a legislature has full power to create corporations, its acts recognizing as valid a *de facto* corporation, whether private or municipal, operates to cure all defects in steps leading up to the organization, and makes a *de jure* out of what was only a *de facto* corporation.' So also, in *Mitchell v. Deeds*, 49 Ill. 416, it is said: 'It will not be denied that the General Assembly has the *same power* to confirm and validate an irregularly organized corporation, as it has to bring into existence a new one.' It will be noted that in the first quotation the rule is stated to be applicable '*when* the legislature has *full* power to create corporations,' and in the second, the power to validate and confirm is stated to be the same as 'the power to create.' "

Section 1 of Article XIV of the constitution reads as follows: "Corporations may be formed under general laws, but shall not be created by special act, except for municipal, manufacturing, mining, imigration, industrial, and educational purposes, or for constructing canals, or improving navigable rivers and harbors of this State, and in cases where, in the judgment of the General Assembly, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered, amended, or repealed." It may be, as contended, that a special legislative act recognizing or confirming a charter derived solely under the general incorporation law, having no power or existence other than by virtue of that law, would demonstrate, in itself, that it was a charter which could be obtained under the general law, excluding possibility of exercise of the legislative judgment contemplated in the above quoted constitutional provision; but we are not under the necessity of deciding that question, since the provision itself excludes from

the limitation, manufacturing corporations. The Electro-Libration Company, as the complaint shows, was organized as a manufacturing corporation, under that particular chapter of the general laws devoted to the creation of manufacturing and three other specified kinds of corporations. The legislature was, therefore, competent to grant a special charter of the present nature, in the first instance, and, if for no other reason, was competent to confirm or ratify the vices and irregularities inhering in one of the same kind obtained under the general law. See *Central Ass'n. v. Ins. Co.*, 70 Ala. 120, the authority of which we do not here question.

Nor do we think that the exercise of this legislative power can be said to suspend the operation of the *quo warranto* statute for the benefit of this particular corporation or these defendants, within the meaning of the constitution. Section 23, Article IV, of the constitution ordains, that "no special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by a general law, or where the relief sought can be given by any court of this State; nor shall the operation of any general law be suspended by the General Assembly for the benefit of any individual, corporation or association." In connection with this, Section 1 of Article XIV, *supra*, may be read. Section 24 of Article IV, provides. "That the provisions of this constitution, as to special or local laws, shall not apply to public or educational institutions of or in this State, nor to industrial, mining, immigration or manufacturing corporations or interests, or corporations for constructing canals, or improving navigable rivers or harbors of this State." The charge of the complaint is, substantially, that these defendants—*individuals*—are exercising franchises of a manufacturing corporation, under color of a voidable corporate organization had under the general laws of the State, regulating the organization of manufacturing, mining, immigration and industrial business corporations—voidable for a specified irregularity, and for fraud in reference to subscriptions to stock. From this standpoint, then, defendants were not, of right, a corporation, and it is so averred. Therefore, it can not be contended, and is not, as we understand, that these constitutional provisions restraining the passage of special or local laws for the benefit of

corporations affect the present controversy; nor that the relief granted by the act set up in the plea, confirming and, in effect, re-enacting a voidable charter could be given by any court, or obtained under any general law; even if, indeed, that question were open to judicial determination, as we held it was not, in *Clarke v. Jack*, 60 Ala. 271; and it is insisted only that the latter clause of section 23, Article IV, in reference to the suspension of general laws, for the benefit of any *individual*, is contravened by the act in question, in that, it is said to suspend the remedy of the State by *quo warranto*. If upon the true meaning of that provision, as indicated in *Ex parte City Council*, 64 Ala. 463, or other considerations of the several constitutional provisions, when read together, this conclusion could safely be reached, it is clear that it is precluded by the provision of section 24 of Article IV, above copied. That provision excludes from the operation of all the constitutional restrictions, in reference to special or local laws, not only manufacturing corporations, but manufacturing *interests*. It leaves the General Assembly open to pass any special law for the protection or benefit of any manufacturing interests, whether owned and conducted by corporations or individuals. Whether, therefore, the Electro-Libration Company be deemed a corporation, or an unorganized company of individuals, being engaged in the business of manufacturing, special legislation for its or their benefit, in furtherance or protection of such business, is not inhibited, even though such special legislation have the effect of suspending the operation of a general law for the benefit of such interests.

Again, it is insisted that the second section of the ratifying act is upon a subject of legislation distinct from that contained in the first section; and not being comprehended within the title, the first section only is valid, and the second inoperative, under Art. IV, section 2 of the constitution. Whether or no, this is technically true, we need not consider; for the express confirmation declared in the second section, cannot possess greater validating potency than the express recognition of the corporation, as a lawful corporation, contained in the title and first section of the act. The one implies no other or further notice or knowledge, on the part of the legislature, of the vices or imperfections of the

[State *ex rel.* Sanche v. Webb *et al.*]

charter, than the other. The legislative purpose that the corporation shall be deemed and treated as a lawful organization, is not more manifest in the one than in the other. If there is the appearance, or want of appearance, of anything in the act, which impairs its confirmative effect, under the title and first section, equally so would it impair that effect under the second section.

As affecting the inquiry whether the legislature intended the confirmation or not, it is a question which well suggests itself to the mind, whether a ratifying or confirmatory act like the present, will cure the vice of a secret fraud infecting the charter, of which neither the act, nor the charter under legislative review, gives a suggestion or clue. The authorities cited in the foregoing extract from the brief of counsel, and others, seem to hold that such a ratification has the like effect of a direct creation, by original, special charter, of the persons composing the irregular body, into a body corporate, excluding the vitiating effect of all deficiencies, known or unknown, ascertainable or otherwise.—*R. R. Co. v. Cook*, 29 Ill. 240 ; *Goodrich v. Reynolds*, 31 Ill. 498; *Bridge Co. v. U. S.*, 105 U. S. 480 ; *Clinton Bridge Case*, 10 Wall 462 ; Cook on Stocks and Stockholders, § 636, and many cases collected in note ; 1 Thompson on Corp., § 5 2, and other authorities cited by counsel. Chief Justice RUFFIN, however, in alluding to the subject, in *Att'y. Gen'l. v. Petersburg R. R. Co.*, 6 Ired. L. 456, stated the rule in this language : "But on the other hand, if the sovereign—with us, the law making power—with a distinct knowledge of the breach of duty by the legislature, or so clearly to be inferred from its own archives that the contrary can not be, thinks proper by an act to remit the penalty, or continue the corporate existence, or to deal with the corporation as lawfully and rightfully existing, notwithstanding such known default, such conduct must be taken, as in other cases of breaches of conditions, to be intended as a declaration, that the forfeiture is not insisted on, and, therefore, as a waiver of the previous defaults."

But, however this may be, whether the rule admits of the qualification implied in this language or not, we think we may pretermit decision of the question, in this cause. It must be assumed that the legislature was cognizant of all the terms of the charter it had under

[State *ex rel.* Sanche v. Webb *et al.*]

review; and was impressed with all inferences which might be drawn from them; and that it was cognizant of all facts which may be fairly inferred from the terms of the enactment itself. It must be assumed, also, that it was aware of all pertinent facts which the parties now, by their pleadings, admit to have been absolutely true. As shown by the record, the charter proceedings disclosed that the contract of subscription was for the entire capital stock of one million dollars, and was to be discharged, and was discharged, by the transfer to the company of invention rights mentioned in the contract and in the complaint. The demurrer to the plea in question admits, that the stock was issued for property actually received which was conveyed to the company according to the terms of the subscription; that the subscription was made in good faith, and without any fraudulent intent to violate the law or the constitution in that respect, but in the honest belief that said patent and patent rights and inventions were of large intrinsic value, which belief was proved to be true by the subsequent investigation and developments thereof. The title and first section of the act, in connection with the disclosures of the charter proceedings, above recited, and, indeed, independently thereof, fairly show that the sole legislative purpose was to correct the vice of an over-valuation of the consideration upon which the holders received the one million dollars of stock. The language of the first section admits of no other interpretation. With a knowledge of the fact that the entire amount of the authorized stock was taken and became paid up, by the transfer which was made to the company, the legislature enacted that the amount of the capital stock be reduced from one million to one-half million dollars; and, reciting that the subscribers had contributed and surrendered to the company one-half million dollars of the stock which was then in the treasury of the company, enacted that the same be cancelled, and that it should not be issued. And it is fair to presume that the legislature acted under inducement of the now admitted fact, that the original action of the corporators and subscribers was not actually corrupt, but in the belief that the consideration was of large intrinsic value. And, in this view, the further contention that the matter referred to was improperly admitted into

[State *ex rel.* Sanche v. Webb *et al.*]

the plea, will not be sustained. It will be regarded as inducement merely to the enactment, which formed the gravamen of the plea. As alleged, the facts stated, do not of themselves answer, nor purport to answer, the complaint. They are, manifestly, introduced as inducement only; and if, as such, they are unnecessary, and, therefore, of no moment under our system of pleading, they do not render the plea double, and will not be considered. Only the material substance of the plea, as a whole, will be regarded.

The title and first section of the act distinctly mark, by minute description, the charter here involved, as the subject of legislative action; and its recognition as a lawful corporate body, including expressly, we may say, the integrity and validity of its reduced capital stock, are so emphatic, that it is impossible to reach another conclusion than that the act was, in legal effect, for the purpose of this controversy, a re-enactment of the charter, curative of all vitiating elements alleged against it in the complaint.

But it is suggested that the question under discussion may be affected by section 6, Art. XIV of the constitution, which reads as follows: "No corporation shall issue stock or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of general laws, nor without the consent of the persons holding the larger amount in value of stock, first obtained at a meeting to be held after thirty days' notice is given in pursuance of law."

It must be kept in mind that the question for decision here is, whether the legislature may, by enactment, correct and waive the vice of a fraudulently organized corporation—fraudulent, in that the corporators knowingly issued the amount of the authorized capital stock for property worth greatly less than the par value of the stock? There was no issue of stock beyond the amount of the authorized capital. It was issued, according to the plea, for property of large value, actually received by the corporation. In view of the fraudulent overvaluation of the property received, the legislature intervened and took action, by reducing the amount of the

stock which said property had purchased, to the extent of one-half, and by cancelling the remainder of the shares, which had been relinquished and surrendered to the corporation by the share-holders. Assuming the validity of this enactment, its effect was to establish, conclusively, that the property received and held by the corporation was a fair equivalent of the amount of the stock so reduced; to purge the corporate organization of all fraud, and to establish it as an honest, valid corporate body. Does the provision of the constitution last above quoted contain any limitation upon the power of the legislature to accomplish such a result as this, is the important question to be considered. It must be confessed, that it is not easy to understand the scope and meaning of the provision; and the construction which the same, and similar constitutional and statutory provisions in other States, have received in the adjudged cases leave the mind rather in a state of uncertainty than enlightenment; so much so, that Mr. Cook was led to observe, that they had about denied it any effect at all.

The provision is evidently of far reaching importance, and it would be unsafe to undertake to define, abstractly, its scope and effect. Each case invoking the provision, should be cautiously decided as it arises, upon the questions actually presented. We may illustrate its importance by inquiring, what is meant by "money, labor done, or money or property actually received?" Can no stock or bonds issue by any corporation, until it has actually received full payment for the stock or the full consideration of the bonds? Must the money or property have been received, or the labor actually performed, before the subscriber can become a stockholder? If so, are stock or bonds issued without such prepayment, intended to be declared void by the provision in question, and, if so, what is their nature in respect of their validity, when put upon the market and passed into the hands of *bona fide* purchasers? Does the general principle that a contract or obligation, even of a commercial character, which is denounced void as against public policy, by the written law, is void even in the hands of *bona fide* holders, apply, under this constitutional provision, so as to render utterly invalid, in all hands, stock issued by a corporation, within the

[State *ex rel.* Sanche v. Webb *et al.*]

limits of its authorized capital, if full payment therefor has not been received, or if fraudulently issued, as fully paid up, without consideration, or for a grossly inadequate consideration? Or does the provision in question, as held by some of the courts, mean to declare void only stock and bonds which are wholly fictitious? It seems to be well settled by the authorities that there is a vast distinction, under the general law of corporations, between the nature and effect of corporate stock, in the hands of *bona fide* holders, which has been wrongfully or fraudulently issued by the corporation or its officers, within the limit of the authorized capital, and a fictitious increase of stock issued after the authorized capital had been exhausted. It seems to be settled a *bona fide* holder of the first kind, becomes a fully protected shareholder, invested with all the rights and privileges of a shareholder who has honestly purchased and paid for his shares, whereas, a purchaser of fictitiously increased stock, though *bona fide* and for full par value, does not become a shareholder, and can claim nothing by virtue of such shares. His remedy is by action for deceit, against the corporation or officers who wrongfully placed the spurious stock upon the market, inducing him to purchase. Does the provision under consideration intend to recognize this distinction, or is all stock issued for other than "money, labor done, or money or property actually received," or fraudulently issued, whether within the authorized capital or not, to be deemed a fictitious increase and void? Is the generally recognized authority of corporations to declare stock dividends abrogated?.

These questions, we do not think arise in the present controversy. We state them to call attention to their importance, and to emphasize the care which should be observed in expounding this provision of the constitution.

As we have already shown, the other provisions of the constitution which have been discussed, do not alter or affect the sovereign power of the State, through its legislature, to create manufacturing corporations like this, either by original charter, or by confirmation or ratification of organizations irregularly or even fraudulently accomplished. The State and the corporation, so far as the grant of the franchise is concerned, are the sole par-

ties to the compact, and as individuals may confirm for themselves fraudulent agreements, so may the State. Giving Section 6, Art. XIV its broadest scope, it only declares void the *stock* itself, which constitutes a fictitious increase. It makes no reference to the organization of the corporation—to the grant of the corporate franchise. The plea shows that, in the organization of this corporation, the issue of this stock was not wholly fictitious. A property of large value was paid for it. The legislature took cognizance of this fact, and of the further fact, as it ascertained for itself, that the property received by the corporation was worth only one-half of the par value of the stock issued, and the shareholders assenting, and delivering up one-half of their stock for cancellation, the amount of the capital was reduced one-half, and the surrendered stock annulled, and by this action and confirmation the fraud of the original organization was expurgated, and the grant of the franchise rendered unassailable. We think there is no semblance of a limitation upon the power of the State to accomplish this result. Let us suppose that this company had been organized, by the payment by the subscribers (in fraudulent collusion, we will say, with the corporation) of $500,000, in cash for the one million dollars of stock, and the company, under its organization, was engaged in its business, and the General Assembly had passed an act reducing the capital stock to $500,000, and cancelling the fraudulently issued excess of $500,000 of stock, which had been returned to the treasury by the shareholders for cancellation, could any one deny the *locus penitentiae* for such a purpose? Would not all the fraud or fiction in the issue of the stock and organization of the company be wiped out? Could it be questioned that the legislature could grant to a manufacturing company an original charter upon an actual subscription of $500,000, as the limit of the authorized capital, actually paid in, in cash, by designated subscribers? The act in the present case accomplished no more than this. It ascertained that the subscribers had actually paid in $500,000, and accorded to them only stock to that amount. Having sovereign power over the matter, its ascertainment is conclusive.

After demurrer overruled to this plea, the plaintiffs declined to plead over to it; but did join issue on other

[State *ex rel.* Sanche v. Webb *et al.*]

pleas, strictly in bar. Without sending those issues to the jury, the court rendered judgment for the defendants, upon the plaintiff's confession of the plea in question. It is not denied, but admitted, by counsel, that this action of the court (save as to the disposition of costs), was correct, unless the peculiar nature of the plea, confessed excepts the case from the operation of the general rule.—*Pickett v. Pope*, 3 Ala. 552; *Fireman's Insurance Co.v. Cochran*, 27 Ala. 229.

As we have said, the plea, in its conclusion, purports to be in bar of the further maintenance of the suit. In its body, it purports to be a plea since the last continuance. In our system of pleading forms are not essential; and we do not regard, in that particular, the English common law rules which counsel now invoke. We look to the substance of the plea, and thereby determine its legal effect. In the present instance, the matter pleaded arose after the institution of the suit and before plea pleaded. It is, therefore, a plea *puis darrein continuance* strictly. Section 2848 of the Code provides what judgment shall be rendered as to costs, when the defendant succeeds on a plea of this character. Its provision is that when the party filing a plea "since the last continuance," succeeds thereon, but fails on the plea to the merits previously filed, he must be taxed with the costs which accrued previous to the filing of the last plea. This statute, obviously, dispenses with all necessity for offering in the plea to pay such costs. It prescribes a mandatory rule of action for the court, the observance of which the defendant, filing the plea, by no act nor omission on his part, can prevent. He files the plea with the knowledge that, by the statute, the court must tax him, on its success, with the specified costs. He thereby assents to such taxation, and, impliedly offers to submit to the same. The question now made, arises out of our statute suffering pleas of this character to be filed, with other pleas to the whole action; which was not allowed at common law. Discarding technical differences, which were, perhaps, indulged by the common law, more with respect to form than substance, the plea (save as to the proportion of costs taxable against the defendant) is, with us, at last, in its essence and effect, an answer to the whole complaint. It may be true, and doubtless is, that the defendant, if he has other pleas in

[Warren v. Liddell.]

bar, not confessed, may demand trial upon those pleas, to the end of relief from all costs; and, upon his appeal from adverse rulings in that behalf, his rights would here be vindicated. But if, as here, he accepts confession of the plea, in question, and waives trial upon the rest, the plaintiff is not hurt, but benefitted, by absolute immunity from all costs incurred prior to the plea. The matter is for the defendant's complaint and not the plaintiff's.

We think, therefore, that the judgment of the circuit court was right, except in that it awarded all the costs against the plaintiff. We have but to correct that error here; and it will be done by adjudging all the costs which accrued prior to the 4th day of May 1893, including the costs of the other pleas and demurrers thereto, against the defendants; and the judgment as thus corrected, will be affirmed. The costs of the appeal will be divided between the parties.

Corrected and affirmed.